We will hear argument next in Case No. 23-2173, iTherapies v. Slayback Pharma. Good morning, Your Honors. May it please the Court. The Board made a number of errors that independently warrant reversal or remand, and I'd like to begin with the Board's construction of consisting essentially of, which cut a wide swath through the Board's obviousness analysis. Now, on this issue, the parties agree on two things. First, that consisting essentially of was an important issue during prosecution because the applicant used it to distinguish the prior art. And second, the scope of consisting essentially of can be narrowed during prosecution through lexicography or disclaimer, and that's what happened here. During prosecution, to distinguish the combination therapy disclosed in Dean, the applicant amended the claims to add consisting essentially of and argued that this language excluded any other active ingredients besides low-dose bromonidine. Now, the applicant made that point several times, including two instances. Just to be clear, so the claim construction that you think is correct is one that excludes all active ingredients except the low-dose bromonidine? Correct, Your Honor. Okay, that's the formulation? Correct, Your Honor. And that formulation of your construction had some importance to your response to footnote 24 of the Board's decision, right? I think that would be fair, yes, Your Honor. Okay. Now, the applicant made the point several times, including defining on two occasions consisting essentially of, using the definitional clause, i.e., as not including other active ingredients. So the Board erred in failing to give effect to these clear statements of definition and disclaimer in the prosecution history. Now, the Board was apparently concerned that construing consisting essentially of as excluding other active ingredients would give it the same scope as consisting of, but that's incorrect. The 742 patent explains, and there's no dispute about this, that various inactive ingredients can be included in the invention, such as preservatives and buffers, and these inactive ingredients would also be included under I-Therapy's construction, even though they're not expressly claimed. Is there case law or established practice, one way or the other, for the meaning of a consisting of X and whether that precludes, you know, inactive ingredients? Well, Your Honor. Excipients and whatever. If we're talking about consisting of, I believe the case law generally says consisting of is a closed-ended preamble, and so it would exclude anything that's not specifically listed in the claim. So the only way to get this construction, that is, what is in the parenthetical, for example, to A-1055, is by using consisting essentially of so that you can include inactive ingredients but not active? Correct, Your Honor. Consisting essentially of, as this Court has held, is a basically in-between transition clause that can include other components that do not materially affect the basic and novel properties. But with respect to these inactive ingredients, like excipients and buffers and so forth, the applicant made that very point during prosecution by pointing to Example 10 of Dean and conceding that Example 10 of Dean does meet the consisting essentially of requirement, even though it includes inactive ingredients in addition to bubonic. Where's that? So that would be at Appendix 1058, where the applicant said that Dean discloses only one composition consisting essentially of bromonidine, and this composition has bromonidine at a concentration of 0.2 percent, citing Example 10. And Example 10 has inactive ingredients and whatnot. Correct. So my point here, and I don't believe there's been a dispute about this in the briefing, my point here is that the Board simply got it wrong. Our construction does not conflate consisting essentially of with consisting of. So can I ask you this question? Suppose we were to agree with you about that, then the decision of the Board has to be vacated. What else is important for, in your view, for us to say to make sure that the Board not only reconsiders its particular judgments to the extent that those judgments are affected by the claim construction, but anything else in the Board's decision that might be worth, if not deciding, by us now flagging? Understood, Your Honor. The claim construction enough would be enough to warrant at least a remand, but to your question, what's there? But you don't want to go back and the Board say, you know, footnote 24 makes all of that irrelevant, for example. Right. Let me, I want to make sure I'm answering your question. I would say that the, it would be very helpful if the Court could address the closest prior art issue, because that was another area. Whether Gill was the closest prior. Right. And that actually does intermesh with the claim construction issue as well, and I can explain that in a moment. And I think it would be also helpful if the Board could, excuse me, if the Court could address the teaching away or the Alpha GAN studies that we presented as evidence of both teaching away and as a rebuttal to expectation of success. So those are two major areas where it would be helpful to have guidance from the Court so that we don't end up on a round trip here on these same issues. But I would like to, if I may, address footnote 24, because you brought it up a couple times, and I want to make sure I do address that. So footnote 24 is where the Board prophylactically tried to apply a narrower construction. And Slaback has incorrectly stated that this was basically the Board saying even under iTherapy's construction, it would still reach the same result. But the problem is footnote 24 doesn't use iTherapy's construction. Footnote 24 still relies on a construction that allows other active ingredients, like in Norden, and that was not how the applicant defined consisting essentially of during prosecution. So we don't believe footnote 24 can salvage the Board's opinion under the correct construction. Now, as I was mentioning, this construction also infected, I should say this claim construction error, also infected the Board's determination of the closest prior art for comparative purposes. iTherapy's presented clinical data showing unexpected results of the claimed invention versus Visine, which at the time was the prevailing gold standard eye redness reliever on the market. And this test ensured that bromonidine low dose was five times more effective than Visine in reducing eye redness and without any side effects. The Board rejected those results and held that iTherapy should have tested against 0.03 bromonidine, which is found only in GIL Example 1. Now, first of all, GIL Example 1 isn't a method of reducing redness, and so it shouldn't have been even considered as part of the closest prior art because the most important limitation in our claims is a method of reducing redness. But even putting that aside, under the proper construction, remember GIL Example 1 is a combination therapy, not a monotherapy. And so under the proper construction, the Board certainly could not have pointed to GIL Example 1 as the closest prior art. What do you think is the closest prior art? We believe that Visine is the closest prior art under this Court's rationale as set forth in In Re Merchant. Whenever you're dealing with closest prior art, by definition, there's going to be at least one limitation missing. And so the question is, what are the important limitations? And here, the important limitations in these claims is that it's a method of treating eye redness, that it's a monotherapy, that it's an ocular drop that's applied for that purpose, and it's a low concentration. And on all of those limitations, Visine is the closest prior art. Now, we concede it doesn't have bromonidine, but as an alternative argument, we also pointed to the alpha-GAN studies to say, well, if you want to look at something with bromonidine, the alpha-GAN studies would be the closest prior art. And again, our clinical data showed unexpected improvement over the 0.5 and 0.2 percent alpha-GAN studies, which showed some blanching or whitening of the eye but with side effects. And that blanching or whitening fell off dramatically below 0.2 percent concentration. And so we think there's an error there. If the board, under the correct construction, was still to insist on using 0.03 percent bromonidine from GILD example one, it would have to extensively modify that in order to make it essentially the closest prior art. It would have to get rid of all of the other active ingredients, and it would have to completely change the protocol to make it a method of reducing eye redness instead of a method for basically treating pain or preventing pain. And that would run headlong into this Court's ruling in Millennium, that the applicant is not required to test against a hypothetical compound or treatment method that's actually not disclosed in the prior art or not tested in the prior art. Going back to footnote 24, it seems like the board's suggesting almost a middle ground claim construction, where consisting essentially of means consisting essentially of only one active component for eye redness, but it can include other active components, which seems like that's what footnote 24 is referring to. Your statement with respect to DEAN, i.e., methods which do not include administering other active agents, why couldn't that mean that the board's construction in footnote 24 is correct, that essentially what you're consisting essentially of means only one whitening agent or only one anti-redness agent, but it can't include other active ingredients? Well, I think the problem with that is DEAN, the other active agent in DEAN was rizolamide, and rizolamide was not there as either a redness-reducing agent or any other reason. It was a treatment for glaucoma, and so when the applicant argued that DEAN is distinguished because of this consisting essentially of, and the board, excuse me, the examiner accepted that argument, that was basically saying no other active ingredients. Regardless of what they're there for, no other active ingredients. It's a monotherapy, which, by the way, is fully consistent with, if you take a step back and look at what this invention is all about and you look at the Federal Register, these are monotherapies for treating essentially minor eye redness. That's what the applicant was trying to convey during prosecution and did so with this definitional language. So I do agree with you that the board was trying to reach some sort of middle ground in footnote 24, but even that middle ground is not what the applicant was arguing during prosecution. I would just like to make one last point. I've eaten into my rebuttal time here, but on the alpha-GAN studies, we also think there is a legal error there, especially when you look at what the board accepted as evidence of expectation of success, which is an entirely prophetic hypothetical rabbit study that wasn't even capable of measuring eye redness and had no data whatsoever versus actual human clinical data showing a clear dose response with the whiteness or the blanching dropping off below 0.2%. When you put those two on the scale, the idea that the board essentially elevated the prophetic rabbit example and, I'm going to say, gave the back of the hand to the human clinical data, we think is both an error of substantial evidence as well as a legal error under this Court's cases, such as University of Strathclyde and OSI pharmaceuticals. And I'd like to reserve the rest of my time. Thank you. Good morning, Your Honors. I may have pleased the Court. Kevin Martin on behalf of SLABAC. Your Honors, this case involves one straightforward claim construction question and an application of the substantial evidence standard to the board's factual findings concerning the prior art. I'll start with claim construction as my brother did. On claim construction, eye therapies doesn't argue that the board really got the law wrong in considering the claim construction issue. It just argues that the board misread the prosecution history, and the board clearly did not. If you look at the arguments that they fronted today, those arguments were being raised for the first time in a reply brief in an oral argument, and if they were right, they would have been raised before. Let's take the IE argument, for example, which was a major focus of their reply brief and a major focus of the argument today. When you say the reply brief, you mean the reply brief on appeal? To this Court. Right. If you look at their opening briefs of this Court, they never argued that IE was a definitional term in the prosecution history. They actually referred to that. They did argue, though, that this was the proper construction, and they relied on the prosecution history, including those pages, right? It's really interesting, though, because every place that they refer to those pages, they surgically excise the IE, except for one place in the background section. They have a long block quote where they include the IE, but in the introduction and in the argument, every time they talk about the parenthetical, they don't include the IE. They are certainly not arguing that IE are magic definitional words, the way they are in their reply brief to this Court and the way that they did this morning. The same thing happened below, before the board. They referred in a couple of places, once in their supplemental opening brief, once in their supplemental reply brief, to the parenthetical. Both times, they left out the word IE. I'm sorry. If I'm looking at the opening, maybe I just want to make sure I'm not confused. If I'm looking at the opening brief, looking at the blue brief. Yes, Your Honor. It's 13 to 14. There's the quote there with the IE. Right. That's the block quote where it appears. But then when you look at the other. I'm sorry. The IE is bolded. That's in the original, I believe it's bolded. So they're not really calling attention to it. If you look at the introduction. It's actually not in the original. Oh, it's not? Okay. No, it's just emphasis added. So I apologize for that, Your Honor. But if you look at the introduction and if you look at the argument section, when they start talking about this language, they never refer to the IE. And their argument now is that IE. So you're arguing waiver? I'm arguing waiver and forfeiture because it was never argued to the board that IE is a definitional term of art that requires this use. But they did argue that they defined it in the prosecution history through these three pages, right? I don't dispute that, Your Honor. Okay. What I dispute is that their argument that IE is definitional. Well, why don't you just tell us why it's why it's why. Why don't you go to the mayor and explain why it is that this isn't definitional. It was wrong, Your Honor. Rembrandt, which is their leading case, says that IE is not always definitional. You have to look at the context. Well, setting that aside, why wouldn't a person of ordinary skill in the art reading these three pages, looking at Dean, understanding, you know, the claims and reading the specification, why wouldn't this they think that this is defining consisting essentially of to mean Ramona Dean and not other active ingredients? Because if they wanted to say that, Your Honor, I think they would have said that in as many words as Your Honor just did. And what they consistently told the examiner was not that consisting essentially of forecloses, the word they use today is excludes, other active ingredients. What they said was that there But what about the language? It says, A, pharmaceutical composition, which does not include any other active ingredients. That's at page A-1055. Whether it uses IE, and that was pointed out or not, how do you respond to that? It seems to me like a really hard thing for you to respond to. Because, Your Honor, every If you look at the full context of the prosecution history, what they are consistently arguing is that in Dean, the bronzolamide was an essential or required ingredient, and that without that additional ingredient, there would not be treatment of an ocular condition. They can, for example, if you look at 1054 through 1055, right, Dean only can be fairly read to stand for the conclusion that the administration of Ramona Dean alone is not sufficient to treat an ocular condition. 1055, the methods of Dean, the administration of Ramona Dean and the methods of Dean is a necessary but insufficient part of the Todd methods. Again and again and again, we have all the examples in our briefing. They're pointing out that what the applicant told the examiner was that without the bronzolamide, Dean is not teaching how to treat an ocular condition, and they aren't At no point, though, did they ever tell the examiner that it was important and part of their invention that no other active ingredients be present. And the examiner clearly understood this. When the examiner and the reasons for allowance explained their understanding of what was being argued by the applicant, they didn't say the applicant argued that other active ingredients were excluded or foreclosed or prohibited. They said, and this is at 1082, as amended and set forth in the arguments, applicant specifically states that the presently claimed methods do not require the use of any other active ingredients, in addition to Ramona Dean, thereby instating the consistent essentially of language. So the examiner clearly thought that what they were arguing was that other active ingredients are not required, not that other active ingredients are forbidden. Again, if this were part of the invention, if making sure no other active ingredients were there was something that was important for this invention, you would expect there to be discussion of it in the specification. Right? Nowhere in the specification did I say ever that it's important to have no other active ingredients be present when the Ramona Dean is there. They do have embodiments in which there are no other active ingredients, right? No, Your Honor. They have ingredients which are I mean, no other active ingredients. Not a single embodiment, you say. No, that would be and there was a question about how you would frame this, right? If you wanted to have no other active ingredients. And what they could say, and I'm sure Your Honors have seen claims like this all the time, would be a composition consisting of Ramona Dean, maybe a carrier, maybe an antibiotic. But you would have different you would have a consistent claim which lists what you want in there. You could say consisting of Ramona Dean is the only active ingredient plus non-active ingredients. And they've actually gone out and gotten other claims like that. So there are ways to do this, to get to what they're now arguing this was supposed to be, but that's not this. When they say that there are claims which are monotherapy claims, monotherapy, or that never appears in the prosecution history, doesn't appear in the spec, I think what they're talking about are the embodiments which are consisting essentially of Ramona Dean and they don't mention another active ingredient. But, of course, the typical meaning of consisting essentially of is open to other active ingredients so long as they do not, in this Court's, the words of this Court's precedence, materially affect the basic and novel properties of the invention. That typical meaning under this Court's precedence of consisting essentially of is what they told the examiner consisting essentially of meant. If you look at page 1053 in the appendix, the applicant referred to the legal standard and said, you know, that that is the standard. He then went on to distinguish the brinzolamide both by saying it was required and by saying, and this is at 1054, for example, they say brinzolamide was found to be effective in increasing blood flow in ocular tissues. So it's vasodilative. Thus, it is clear that brinzolamide is an essential active ingredient and including brinzolamide would necessarily materially affect the basic and novel characteristics of the invention. Now, how did they characterize that portion of the prosecution history when they were before the Board? What they told the Board was, as the patentee, this is at page 429 in the appendix, as the patentee argued during prosecution, Dean teaches only that brinzolamide lowers intraocular pressure and actually increases blood flow in ocular tissue, inconsistent with the vasoconstrictive effect. Right? So they were below, both before the examiner and before the Board, identified the correct legal standard and argued that brinzolamide was inconsistent with the invention under a consistent essentially only of test because it is vasodilative. It's inconsistent with the vasoconstrictive effect that is the point of the brimonidine. And under this Court's precedence, the Board correctly had discussed cases like Ecolab and AK Steel. If you have other active ingredients that will serve the same purpose, that's okay. It's when you get into a case like AK Steel where the active ingredient, the additional ingredient in AK Steel would be inconsistent with the purpose of the invention, then you run into trouble. And that's the way they distinguish Dean. I do want to make the point, Dean Example 10 is something else that was not ever raised to the Board or raised in the opening brief to this Court. They have two pages of it in their reply brief. They mentioned it again today. If Dean Example 10 had the weight they say it did, then they would have raised it before. The way we understand what the Board meant when it said you're effectively turning this into a consisting of claim rather than consisting only of is that they were saying consisting only of has the ordinary meaning that you can have other active ingredients. You're effectively trying to treat this like a consisting only of claim to the extent you would leave other ingredients out. I do want to get to the... Let's go back to the quote on 1061. Dean teaches away from methods consisting essentially of administering, for a minute now, i.e., methods which do not include administering other active agents. Looking at that, it looks like a definition. It looks like a definition. It looks like the parenthetical is trying to describe that consisting essentially of phrase. If that's a clear, at least it seems like a clear definition, where is the clear statement that defines it in a different way? It would be every other place in the prosecution history, Your Honor. Talking about the clear statement,   I would say, for example, on 1083, when the applicant was defining the basic and novel characteristics of the invention, what the applicant said was one of the basic and novel characteristics of the presently claimed methods... I'm sorry. You're at 1083? 1053, Your Honor. 1053. ...is that they do not require the use of every other, of any other active ingredients in addition to varmonidine. So when they said... Why isn't that statement consistent with this definition? Because this is require. In every other place that they talk about this, they say require or they say that the bronzolamide, the bronzolamide in Dean was essential, right? So this is all about required, essential, needed. Without the bronzolamide, the method was insufficient. You cannot... Under this court's precedent in Rembrandt... I'm sorry, Your Honor. I'm sorry. One of them is why isn't not requiring other active agents consistent with this definition that says it doesn't include other active agents? We gave the example in our brief of applied groups are not required, but it's allowed, right? So when they say required, that's consistent with the ordinary meaning of consisting essentially of, in which you have to have at least the listed ingredient, but you can have others if they're not inconsistent. What is the scope of a claim that allows but does not require other ingredients? I mean, it seems like it's kind of not very valuable if that's how it's interpreted. I'm not sure I understand the question, Your Honor. I mean, you get to include other active ingredients as long as they're not, for example, vasoconstrictive, which is the way that, as we pointed out, they distinguished Dean both before the examiner and the board. They pointed to the fact that it had this vasoconstrictive effect. Again, pages 4 to 29 and 1054. So, for example, would the claim then cover something that has two active ingredients, both of which reduce eye redness? You would have to look at the facts of the particular case. I gave you the facts. That's my hypothetical. So that is often the case, Your Honor. And if you look at this Court's decisions, like Echolab and Corning. It's a yes or a no. Could you answer my question? I will say yes. I think why I'm hesitating is maybe you have too much of a good thing and then it becomes a bad thing. But I think in the ordinary circumstance under this Court's precedence, like Echolab and Corning, you are allowed to have other ingredients that serve the same purpose. I'd like to get to the alternative claim construction as well. Can I just ask one more question on the basic thing? And I'm not sure I'm going to get the wording right, but the board seemed to say, I think this is at page 14 of the appendix, the claim methods cannot include additional active ingredients that are required to perform the method. And I think eye therapies argues that, actually, because they figured out that the benefit can be had with the brimonidine alone, nothing would ever be required. And so the board's view makes a nullity of the change of the transitional phrase to consisting essentially of. So I think there are two ways that would not be the case. One would be if you just had too little brimonidine. There's not enough brimonidine. It's not enough to have a whitening effect. Therefore, you need a second ingredient to get you there. That would not infringe. The second. But I thought the discovery here was with the amount of brimonidine claimed, you do get that effect. Right. So this is now getting. Nothing else would ever be required. No, this is getting to infringement, Your Honor. So if you had not. Isn't it the scope of the claim? What's that, Your Honor? It's low dose, right? So it's the scope of the claim? It's low dose, but there's a specific range claimed. And so I suppose if you were below the dose, right, you would no longer have enough brimonidine to. And actually, the claim doesn't even require redness reduction. At the end of the day, it just requires giving the ocular drop in a method. It does not require success, according to the board's claim instruction. Your Honor, I do want to get to the alternative construction issue, because I realize I'm running out of time here. In addition to the footnotes that Your Honor has focused on, I want to point to another finding. This is also on page 54 of the appendix. And it's a finding that they have not addressed, even though we raised it in our response brief, and it goes directly to this point. This is the finding. The board says, We credit the testimony of Dr. Scher, who explains that a POSA would have been motivated to use a single active ingredient to avoid possible negative side effects from a second drug. Right? So there's a factual finding that a POSA would look to use a monotherapy, because you would potentially have side effects from a second drug. So if their argument is that this claim only covers monotherapy, only covers a single drug, the board found that a POSA would have been motivated to use just the brimonidine to treat eye redness, and they have not challenged the factual basis for that finding in their appeal. Thank you. Thank you, Your Honor. Just a few points on rebuttal, if I may. First, on the waiver point, we did raise this below. I would point, Your Honors, to Appendix Page 13, which is where we're at. Can you get more to the merits? Okay. Let me also address, there was a question about whether the specification discloses any embodiments that use only brimonidine by itself, and of course it does. Examples 1, 4, and 5, which are set forth in Appendix 164 through 65, each of those examples is brimonidine alone. And as we explained in our brief at Appendix Page 162, when the patent specification transitions to a discussion of combination therapies, it prefaces that by saying, in addition to using brimonidine by itself, you can also use it in combination. So clearly there is a disclosure of brimonidine by itself, and that is what is being claimed in these claims. With respect to Ecolab, which my colleague pointed to, Ecolab, as we explained in our brief, is a fully distinguishable case. It does not stand for the blanket proposition that consisting essentially of always allows the use of other active ingredients. Instead, it was a fact-intensive case where the prosecution history, an argument was made during prosecution that the consisting essentially of excluded other active ingredients. The examiner disagreed. The applicant changed course and never made that argument again. So that is factually distinguishable from our case. We don't believe Ecolab is on point here. With respect to Judge Scarcey's question about the comment about required, we agree with, I believe, what you were saying, Judge Scarcey, is from a pharmaceutical context, in the context of what this invention is all about, when the applicant said a basic and novel property of our invention is that it does not require any other active ingredients. In the pharmaceutical context, that's understood to mean you're not including other active ingredients. It's not a combination therapy, because in pharmaceuticals, the only reason you would ever include another active ingredient is because it's required, and I think that was made further clear through the discussion and the distinguishing. Does that point, what you just said, align with what Mr. Martin said, I think, really, on a motivation piece of the obviousness analysis, that what you just said is, in fact, a motivation to start shedding members of a set of more than one active ingredient, because you never know what the second one might do? Sure. I think he was pointing to a statement in the Board's opinion, basically referring to their expert, Dr. Scherer, who said there would be a motivation to use only one active ingredient so that you don't have to risk the side effects from other active ingredients. The problem is the Board never actually used that. It cited Dr. Scherer's comments on that point, but that wasn't what the Board did. If you read the Board's obviousness analysis, it did not modify Example 1 of Gill by getting rid of all the other active ingredients. If it had tried to do that, it would have then had to explain how you're not destroying the basic intended use of Gill Example 1. What the Board did instead was cite its own claim construction and say, it's okay that there's these other active ingredients because we don't read consisting essentially of as excluding other active ingredients. And then it dropped footnote 24 as a prophylactic and said, even if some active ingredients are allowed that don't, that basically don't are needed for redness reduction, the claim is still obvious. But it was basically relying on Norton, which still includes other active ingredients. That wasn't our claim construction. Thank you. Thanks to all counsel. Case is submitted.